UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ILYA VETT,

Plaintiff,

-against-

CITY OF NEW YORK, et al.,

Defendants.

No. 20-cv-2945



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11/7/2023

## DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' DAUBERT MOTION; AND GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

McMahon, J.:

On September 21, 2018, Plaintiff Ilya Vett ("Vett") was arrested and charged with attempted criminal possession of a firearm in violation of New York Penal Law §§ 110/265.01-b(1). On March 7, 2019, the prosecutor moved to dismiss the charges, and Plaintiff's criminal case in connection with his September 21, 2018 arrest was dismissed.

On April 9, 2020, Plaintiff brought a six-count action against the City of New York (the "City") and its police department (the "NYPD"), as well as a number of named and unnamed NYPD officers, seeking damages for the alleged deprivation of his civil rights pursuant to 42 U.S.C. § 1983. In January 2022, this Court dismissed some of the claims and parties. Plaintiff withdrew his claims against two of the officers in July 2023. The remaining identified defendants are as follows: the City; Officer James Taylor ("Officer Taylor"); Sergeant James Kelly ("Sergeant Kelly"); and Detective Thomas Schick ("Detective Schick") (together, the "Defendants"). The John Doe defendants have never been identified.

1

The following claims remained in the case after the motion to dismiss and the withdrawal of claims:

1. § 1983 False Arrest against Officer Taylor, Sergeant Kelly, and NYPD employees John Does 1-5;

2. § 1983 Malicious Prosecution against Office Taylor and Detective Schick;

3. state law malicious prosecution against Officer Taylor, Detective Schick, and the City;

4. § 1983 "Manufacturing of Evidence" against Officer Taylor and Detective Schick;

5. § 1983 Denial of Right to a Fair Trial against Officer Taylor, Sergeant Kelly, Detective Schick, and NYPD employees John Does 1-5; and

6. § 1983 Deprivation of Liberty against Officer Taylor, Sergeant Kelly, Detective Schick, and NYPD employees John Does 1-5.

Defendants have moved for summary judgment on Plaintiff's remaining claims, arguing that (1) there was probable cause for Plaintiff's arrest; (2) the existence of probable cause precludes Plaintiff's false arrest and malicious prosecution claims; (3) in the alternative, Defendants are entitled to qualified immunity; and (4) Plaintiff has abandoned his deprivation of liberty and fair trial claims. Defendants filed a motion pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) to preclude the testimony of Plaintiff's firearms expert, Officer Peter Miscia.

The Court must first consider the admissibility of Officer Miscia's testimony, and only then turn to Defendants' summary judgment motion. "If the expert testimony is excluded as inadmissible, the court must make the summary judgment determination without that evidence." *In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 168 (S.D.N.Y. 2018) (quoting *Water Pollution Control Auth. of City of Norwalk v. Flowserve US Inc.*, No. 14-cv-549, 2018 WL 1525709, at *5 (D. Conn. Mar. 28, 2018)).

The motion to exclude Officer Peter Miscia's testimony is granted in part and denied in part. However, that ultimately makes no difference to the outcome of the case: Defendants' motion for summary judgment is granted because, on the claims that have not been abandoned, Defendants are entitled to dismissal.

## LEGAL STANDARD FOR SUMMARY JUDGMENT

A party is entitled to summary judgment when there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248 (1986). A fact is "material" "if it might affect the outcome of the suit under the governing law." *Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 242 (2d Cir. 2020). The relevant inquiry on summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

On a summary judgment motion, the court must review the record in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party always bears the initial responsibility of demonstrating the absence of a genuine dispute as to any material facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has carried its burden, the non-moving party "must come forward with specific facts showing there is a genuine issue for trial," *Matsushita*, 475 U.S. at 587, bearing in mind that "the mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. If the non-moving party

fails to make a sufficient showing on an essential element of his case with respect to which he

has the burden of proof at trial, then summary judgment will be granted. *Celotex*, 477 U.S. at

323.

I place this at the beginning of the opinion, before discussing the facts of the case,

because the first order of business is a technical matter: Defendants argue that the facts set forth

in Defendants' Rule 56.1(a) Statement should be deemed admitted, because Plaintiffs have

failed, in their responsive papers, to comply to Local Rule 56.1 of this court.

Defendants are correct.

"The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment

motions by freeing district courts from the need to hunt through voluminous records without

guidance from the parties." *Holtz v. Rockefeller & Co*., 258 F.3d 62, 74 (2d Cir. 2001) (internal

citation omitted). Local Rule 56.1(b) requires that papers opposing a motion for summary

judgment include a "correspondingly numbered paragraph responding to each numbered

paragraph in the statement of the moving party, and if necessary, additional paragraphs

containing a separate, short, and concise statement of additional material facts as to which it is

contended that there exists a genuine issue to be tried." Local Rule 56.1(b). Failure to provide a

responsive Rule 56.1 statement usually means that the material facts in the moving party's

56.1(a) statement are deemed admitted as a matter of law. *See* Local Rule 56.1(c); *Hi Pockets,*

*Inc. v. Music Conservatory of Westchester, Inc.*, 192 F.Supp.2d 143, 147 (S.D.N.Y. 2002);

*Davis–Bell v. Columbia Univ*., 851 F.Supp.2d 650, 658 (S.D.N.Y. 2012).

Plaintiff's response to Defendants' motion for summary judgment does not include a

Rule 56.1 Statement. In opposition to Defendants' motion for summary judgment, Plaintiff has

only filed a Memorandum of Law in Opposition, his attorney's Declaration in Opposition, and

related exhibits. Dkt. Nos. 80-81. These responses are not keyed to Defendants' Statement of Facts.

I will, therefore, accept Defendant's Statement of Facts in the Rule 56.1 Statement as undisputed for purposes of deciding the summary judgment motion. These uncontroverted facts will still be viewed in a light most favorable to the non-moving party (Plaintiff), per the standard of review on a motion for summary judgment. *Matsushita*, 475 U.S. at 587.

The "Background" summary below draws from the admitted, and so uncontroverted, facts.

## BACKGROUND

### I.     Parties

Plaintiff Ilya Vett, a resident of New York City, was employed for approximately 17 years by Disney's theatrical production of *The Lion King on Broadway* ("*The Lion King*"). (Complaint ("Compl.") ¶¶ 2, 5, 15, Dkt. No. 1.) At the time of arrest, he worked in *The Lion King's* puppet department; he also acted as a vendor for Disney Theatrical and/or its affiliates and subsidiaries. Compl. ¶¶ 15, 16.

Defendants Officer Taylor, Sergeant Kelly, and Detective Schick were, at all relevant times, duly appointed and acting officers employed by the NYPD. *Id.* ¶ 11. None of the John Doe defendants have been identified.

Defendant City of New York ("City") is a municipal corporation within the State of New York. *Id.* ¶ 6. At all relevant times, the City employed the police personnel involved in the acts underlying this lawsuit. *Id.*

### II.    The Admitted Facts

#### 1.  The Arrest

On September 21, 2018, Officer Taylor responded to the Minskoff Theatre ("Minskoff")
after he was told that there was an issue on the set of *The Lion King*. (Defs.' Statement of
Undisputed Facts ("Defs. 56.1") ¶ 1, Dkt. No. 73.) When Taylor arrived, the theatre's security
director brought him to a room where a 3D printer was in the process of printing a black plastic
object (the "black plastic object").  *Id.* ¶¶ 2-3. The black plastic object is depicted below. It
certainly looks like part of a gun: it has a handle, an opening where a barrel would typically go,
and two parallel pieces of plastic protruding from the front of it, where a cylinder could be
attached. *Id.* ¶ 4.



Photograph of the black plastic object,
Exhibit C to Declaration of James R. Murray in Support of Defendants' Motion for Summary Judgment

The security director who took Officer Taylor to the prop room also told Officer Taylor that Plaintiff had "issues" with co-workers. *Id.* ¶ 2.

Officer Taylor was not the only officer who arrived at the Minskoff. Sergeant Kelly was told by his supervisor to respond to the scene at the theatre, "because someone had a gun and the employees were in fear." *Id.* ¶ 6. When Sergeant Kelly arrived at the Minskoff, he spoke to the theatre's security director for several minutes. *Id.* ¶¶ 7, 11. The security director gave Kelly a picture of Plaintiff and told him that Plaintiff had manufactured a firearm. He also said, as he had said to Taylor, that Plaintiff was having "problems" with people in his office and had previously had arguments with coworkers. *Id.* ¶¶ 7, 9. The security director told Kelly that other employees at the theatre were scared of Plaintiff and had "pretty much cleared the place out." *Id.* ¶ 10.

Officer Taylor told Sergeant Kelly that he had taken an object from the 3D printer and secured it inside an office. *Id.* ¶ 8.

Plaintiff then walked out of the theatre. Sergeant Kelly immediately arrested him. *Id.* ¶ 11.

Detective Schick, with Officer Taylor present, interviewed Plaintiff at the NYPD's Midtown South precinct, where he was taken following his arrest. *Id.* ¶ 12. Plaintiff told Detective Schick that he owned the 3D printer; that he had downloaded the plans for the prop from an open-source file-sharing website called Thingiverse; and that he was making a plastic prop revolver to give to his brother as a gift. *Id.* ¶¶ 13-15. Plaintiff also said (inconsistently) that he wanted to have the prop revolver "as a prop gun in case someone wanted to rent it for stage or something." *Id.* ¶ 16.

Plaintiff claimed that the prop revolver was never going to be capable of firing anything. *Id.* ¶ 21. When asked by Officer Taylor why, Plaintiff explained that the individual who

uploaded the prop revolver plans to Thingiverse "built right where the firing pin area inside the housing of the pistol." *Id.* ¶¶ 22-23.

At the time of Plaintiff's arrest, Officer Taylor believed it was possible for a 3D printer to create an operable firearm, although he had never used or seen a 3D printer prior to the date of the incident. *Id.* ¶ 28. Detective Schick, Officer Taylor, and Sergeant Kelly had not been trained to use 3D printed "ghost guns" or revolvers, and so were not qualified to determine whether a firearm was operable or whether the black plastic object could be made operable. *Id.* ¶¶ 25, 27. So the black plastic object was sent to the NYPD Firearms Analysis Section, which had the capacity to determine definitively whether an object was an operable firearm or could be made into one. *Id.* ¶¶ 26, 29. Detective Schick told Plaintiff that experts would need to examine the prop revolver to determine whether it could be turned into an operable revolver. *Id.* ¶ 24.

The Firearms Analysis Section concluded, on September 25, 2018 – four days after Vett's arrest – that the prop revolver part was not capable of discharging a live cartridge (i.e., that it was not an operable firearm). *Id.* ¶ 38. The Firearms Analysis Laboratory Report did not analyze whether the object could be turned into an operable revolver. *Id.*; Firearms Analysis Section Laboratory Report, Exhibit I to Declaration of James R. Murray in Support of Defendants' Motion for Summary Judgment.

### 2. The Prosecution

After Plaintiff's interview on the day of his arrest, Officer Taylor told Assistant District Attorney Matthew Sears ("ADA Sears"), the prosecutor assigned to Plaintiff's case, that the Plaintiff said the printer was his, that he was making a prop gun as a gift for his brother, and that the gun was ostensibly inoperable. *Id.* ¶¶ 30, 31. Based on this information, ADA Sears decided to charge Plaintiff with attempted criminal possession of a firearm. In a criminal complaint

sworn out by Officer Taylor, he averred that on September 21, 2018, in *The Lion King* Broadway show's prop production room, he saw 3D printer that was "powered on, moving, and in operation . . . producing a hard black plastic object which, based on my training and experience, is shaped like a revolver in that the object has a hand grip and a pointed, snub-nosed nozzle, and in between the two features, an empty space where it is customary for a cylinder holding live rounds of ammunition to be placed." *Id.* ¶ 34. The criminal complaint also said that Taylor was told by Detective Schick that Plaintiff had confirmed that he owned the 3D printer, that he was making the gun as a gift for his brother, and that he had downloaded the plans for the gun from a website onto the SD card in the printer. *Id.* ¶ 35.

As noted above, the NYPD Firearms Analysis Section concluded, within four days of Vett's arrest, that the "gun" was inoperable. However, the New York County District Attorney' Office (the "DA's Office") elected to start its own investigation into whether the Plaintiff had intended to make an operable revolver. *Id.* ¶¶ 32-33, 37. During that investigation, the DA's Office worked with the NYPD's firearms lab to analyze both the schematics from Thingiverse and Plaintiff's printed prop revolver part. *Id.* ¶¶ 37, 39. According to the Thingiverse plans, if completed, the prop revolver would have had a handle, cylinder, barrel, trigger, trigger guard, and hammer. *Id.* ¶¶ 40-41. The handle grip sides would be black, and the remainder of the prop revolver would appear metallic. *Id.* ¶ 42. In other words, it would have looked just like a real gun – so much so that the Thingiverse prop revolver plan webpage warns people not to carry the prop revolver in public, because "it may look real to people who are not aware" that it is a prop. *Id.* ¶ 43. But the webpage also contains a disclaimer saying that the prop revolver was not a real gun, had no firing pin, and could not be modified to accommodate a firing pin. *Id.* ¶ 44.

Despite the disclaimer, ADA Sears, concerned that the schematics "invite" modification, continued his investigation. *Id.* ¶ 45. The DA's Office obtained a search warrant for the 3D printer's SD card's files, forensically analyzed those files, and interviewed multiple witnesses. *Id.* ¶¶ 46-47. All this took about six months.

Ultimately, on March 7, 2019, ADA Sears moved to dismiss the charges against Plaintiff, because he did not believe The People could prove beyond a reasonable doubt that the prop revolver part could be modified into an operable firearm. *Id.* ¶ 48.

### 3. Prior Proceedings

On April 19, 2020, Plaintiff filed this lawsuit. *Id.* ¶ 51. On April 16, 2021, Defendants moved to dismiss portions of the Complaint. Dkt. No. 21. On January 5, 2022, Defendants' motion to dismiss was granted in part and denied in part. Dkt. No. 30. Several weeks later, the Court dismissed Count 1, Plaintiff's state law false arrest claim, with prejudice as to all Defendants, due to Plaintiff's failure to file a timely notice of claim. Dkt. No. 32.

In July 2023, the parties submitted a proposed stipulation and order of partial voluntary dismissal with prejudice for all claims against two of the named NYPD officers, Officer Nicholas Mauceli and Officer Nelson Tejada. Dkt. No. 70.

During Plaintiff's November 18, 2022, deposition in connection with this case, he stated he believed the prop revolver would look like a real revolver after it was finished printing and confirmed that he intended for the prop revolver to look like a real revolver. *Id.* ¶¶ 49-50.

### DISCUSSION

### I.   Defendants' *Daubert* Motion is Granted in Part, Denied in Part.

Defendants move under Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) to exclude the Expert Report of Officer Peter

Miscia ("Miscia's Report") from consideration in connection with the pending motion for summary judgment, and to preclude Officer Peter Miscia ("Officer Miscia" or "Miscia") from testifying at trial. Defendants move to preclude Miscia's Report, opinions, and testimony on the grounds that (1) he is unqualified; (2) his methodology is not reliable; and (3) he impermissibly assists the trier of fact.

I will allow Miscia to offer only limited opinions. Defendants' motion is granted in part, denied in part.

### a. Legal Standard

Under the standard set forth in Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), the district court serves a "gatekeeping" function in determining whether an "expert" witness really qualifies as one. Rule 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

"The Second Circuit has 'distilled Rule 702's requirements into three broad criteria: (1) qualifications, (2) reliability, and (3) relevance and assistance to the trier of fact.'" *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 27 (S.D.N.Y. 2020) (quoting *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 466 (S.D.N.Y. 2018)).

The party proffering the expert's opinions "has the burden to establish the [Rule 702] admissibility requirements, with the district court acting as a 'gatekeeper' to ensure that the 'expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *In re*

*Pfizer Inc. Secs. Litig.*, 819 F.3d 642, 658 (2d Cir. 2016) (quoting *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2017)). The Court need not "admit opinion evidence that is connected to the existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). In its evaluation, "the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002).

"The standard to evaluate non-scientific expert testimony is whether the expert bases testimony upon professional studies or personal experience and employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Namenda*, 331 F. Supp. 3d at 168 (quoting *La. Wholesale Drug Co. v. Sanofi-Aventis*, No. 07-cv-7343, 2008 WL 4580016, at *6 (S.D.N.Y. Oct. 14, 2008)). The Committee Note to the 2000 Amendments of Rule 702 states, "if the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" Fed.R.Evid. 702 Advisory Committee's Note (2000 amend.)

Ultimately, the *Daubert* standard is a "flexible one," *Daubert*, 509 U.S. at 594, "and will necessarily vary from case to case," *Amorgianos*, 303 F.3d at 266. District courts have "broad discretion in the matter of the admission or exclusion of expert evidence." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (quoting *Salem v. United States Lines Co.*, 370 U.S. 31, 35 (1962)). Even if an expert is qualified, the court must still consider whether the

probative value of the testimony is "substantially outweighed by a danger of . . . unfair prejudice" or likelihood of confusing or misleading the jury. Fed. R. Evid. 403; *see also United States v. Dukagjini*, 326 F.3d 45, 55 (2d Cir. 2002).

### b. The Proposed Expert Witness and Testimony

Plaintiff's expert Officer Miscia has thirty-five years of experience working with firearms in the various positions he has held in the military, law enforcement, and private sector. Report of Officer Miscia, "Miscia Report," Exhibit F to Defendants' *Daubert* motion, at 1. While serving as a Sergeant in the Army from 1987 to 1991, Miscia was responsible for his soldiers' firearms. *Id.*; Miscia's Curriculum Vitae, "Miscia CV," Exhibit G to Defendants' *Daubert* motion, at 4. From 1994 to 2012, Miscia was a police officer in the Township of Montclair, New Jersey. Miscia Report at 1. While on the police force, Miscia served as a firearms instructor, armorer, SWAT team leader, and the Executive Officer for an anti-terrorism task force. *Id.* Since 2012, Miscia has worked at RTSP, LLC, an indoor shooting range and training facility in New Jersey. *Id.*; Miscia CV at 1. As RTSP, LLC's President, Miscia's responsibilities include supervising an in-house gunsmithing team responsible for firearm cleaning, basic and detail assembly and disassembly, part replacement, and upgrades. Miscia Report at 1.  Miscia's more than three decades of experience in military, law enforcement, and private sector give him familiarity with many firearm makes and models. Miscia Report at 1-2. Miscia has prepared expert reports related to firearms in two other court cases. Miscia CV at 4.

In preparing his report in this case, Miscia consulted a variety of sources. He examined the black plastic object bearing an exhibit tag labeled Plaintiff's Number 10, as well as the prop revolver plans, and the prop revolver schematic. Miscia Report at 2, 4. Miscia's Report cites to a diagram of an operable revolver and the schematic of a standard operable revolver, which is

comprised of approximately seventy parts. *Id.* at 3, 5. Additionally, Miscia's Report references the definition of a revolver used by the Federal Bureau of Alcohol, Tobacco, and Firearms ("ATF"). *Id.* at 3.

Miscia drew a number of conclusions about the black plastic object that he examined, as well as about revolvers in general.

Miscia concluded that the black plastic object was one of the thirty parts that comprise a fully assembled prop revolver. *Id.* at 4. Miscia opines, "The black plastic object is nothing remotely similar in completeness to an operable revolver or an imitation revolver." He observes that the object lacked critical components necessary for a functioning revolver: a barrel, a space in the frame to accept a hammer, and a hollowed space within the grip to house a main spring. *Id.* at 3, 5.

Miscia also concluded that the black plastic object, as presented, did not represent anything that could be construed as "dangerously close" to an operable firearm or an imitation firearm. *Id.* at 4. Miscia opined that "the black plastic object is a poorly executed attempt at creating a prop that lacks any logical depiction of an operable firearm or an imitation firearm because a mere 3.33% of the total number of parts are printed." *Id.* at 6.

Miscia further opined that the prop revolver could not possibly be made operable because, when a bullet is fired out of a real revolver, the chamber pressure generated is so great (approximately 50,000 PSI) that "a complete and assembled plastic-printed revolver would explode in the hands of the user." *Id.*

Summarizing his conclusions, Miscia opined that five things "should be obvious to any member of law enforcement:"

(1) "if the remaining 96.67% of the black plastic object were 3D printed," "the black plastic object would still be incapable of functioning as an operable firearm;"

(2) the black plastic object is not an operable firearm as described by the New York State Penal Law;

(3) the black plastic object could never be an operable firearm as described by the New York State Penal Law;

(4) the black plastic object was not an attempt to create an operable firearm as described by the New York State Penal Law; and

(5) the black plastic object was not an attempt to create an imitation firearm under the New York City Administrative Code. *Id*. at 4, 6.

### c. Analysis

#### i. Miscia's Qualifications

Miscia's decades of experience with firearms in the military, law enforcement, and private industry easily qualify him as an expert in what constitutes a firearm and what constitutes an operable firearm. *Id.* at 1.

Defendants argue that Miscia is not qualified to offer opinions on what should be obvious to "any member of law enforcement," or to any member of the NYPD. Though Defendants acknowledge Miscia's experience as a police officer in the Township of Montclair, New Jersey, they argue that Miscia has never been an NYPD officer and so has no direct knowledge of the type of firearms training that NYPD officers receive; they also note that he did not consult with anyone from the NYPD when forming his opinions. *Id.*; Deposition of Officer Miscia, "Miscia Dep.," Exhibit H to Declaration of James R. Murray in Support of Defendants' *Daubert* motion,

at 52:5-7, 52:17-22. Essentially, Defendants argue that to the extent that Miscia purports to be an expert on what NYPD officers know, do not know, or should know, he is not qualified.

Plaintiff counters that Miscia's Report and testimony is "not being offered as a definitive statement on what all law enforcement officers believe nor is he intending 'to speak on behalf of all law enforcement officers in the world.'" Plaintiff claims that instead, Miscia is offering testimony on "how a law enforcement officer in a similar situation and with traditional training would know that one piece of a plastic prop that was in the process of printing could not be an operable firearm." Plaintiff argues that Miscia is "more than qualified under *Daubert* to opine as an expert on the recognition of a potentially operable firearm or a prop of a firearm, particularly by other law enforcement" since he has "operated and worked on thousands of firearms, trained, assembled and disassembled, fired and supervised the use of firearms."

I agree that the phrasing of the report is infelicitous. However, Miscia's lack of personal experience as a NYPD officer does not disqualify him as an expert in the present case and does not persuade me that he should be prevented from testifying. Miscia appears to know, by virtue of his extensive experience as a firearms instructor of police officers, the type of firearms training that is generally given to police officers. That those officers are not NYPD officers goes only to the weight of his testimony, especially as I have no reason to believe (and would be shocked to learn) that the NYPD gives its officers less training, or less comprehensive training, about firearms and what they look like and what makes them operable than other police departments do. It should be left to the jury to evaluate whether Miscia's lack of specific experience with the NYPD renders his opinions suspect.

In this regard, the instant case is much like *Valentin v. New York City*, No. 94-cv-3911, 1997 WL 33323099, at *20-23 (E.D.N.Y. Sept. 9, 1997), where Housing Police Officers

challenged the admissibility of testimony by the plaintiff's expert, Dr. Stephen Leinen, on the ground that the expert was a former NYPD officer, not a Housing Police officer, and so was unable to speak to the practices of the Housing Police officers who were involved in the relevant conduct. The court concluded that this did not disqualify the plaintiff's expert from testifying on the issue of retaliation against police officers who violate a "code of silence." *Id.* The attacks on Leinen were deemed proper subjects of cross examination and went to the weight of the expert's testimony but did not preclude it. *Id.* at 23.

So too here. Miscia's lack of experience with NYPD firearms training procedures goes to the weight of his expert testimony in this case, not to its admissibility.

ii.  Miscia's Methodology

Defendants contend that Miscia did not use any methodology to determine what should "be obvious to any member of law enforcement." Defendants fault Miscia for neither articulating a theory nor technique, nor using data to explain what would "be obvious to any member of law enforcement." Defendants argue that Miscia cannot base his opinions solely on his experience, as he has not explained how his experience qualifies to speak for all members of law enforcement or NYPD police officers.

The Court rejects Defendants' argument that Miscia's opinions lack a reliable methodology. "There is nothing wrong with [relying on experience]: the very text of Fed. R. Evid. 702 provides that an expert can be qualified on the basis of his 'knowledge, skill, experience, training, or education[.]'" *Veleron Holding, B.V. v. Morgan Stanley*, 117 F. Supp. 3d 404, 443 (S.D.N.Y. 2015) (quoting Fed. R. Evid. 702); see *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999). Courts across the country tend to admit police expert testimony, based solely on the expert's professional experience, where it is offered to aid the jury's understanding

17

of an area not within the experience of the average juror, as is the case here. *See*, *e.g.*, *United States v. McElveen*, 129 Fed. Appx. 42, 43 (4th Cir. 2005); *United States v. Thomas*, 74 F.3d 676, 682 (6th Cir. 1996); *Cerbelli v. City of New York*, No. 99–CV–6846 (ARR)(RML), 2006 WL 2792755, at *8 (E.D.N.Y. Sept. 27, 2006). For example, the court in *Cerbelli* found that the plaintiff's expert, Commissioner Pritchard, was qualified to provide expert testimony about certain police policies and techniques (the "policy of encirclement" and "simultaneous shouting") when he arrived at his conclusions by applying his experience, training, and skills to the facts provided to him.[1]

Miscia is a duly qualified expert in firearms and the firearms training given to people who work with firearms. He can give testimony about firearms, firearms training, and, specifically, firearms training for police officers, since he has given such training to police officers for many years. He is familiar with guns in ways that lay jurors are not and so is able to explain to them what guns look like, how they work, and whether a well-trained police officer would have become familiar with such matters in the ordinary course. Again, Defendants can raise questions about Miscia's qualifications and methodology during cross-examination, but that goes to weight, not admissibility. *See Cerbelli*, 2006 WL 2792755, at *7. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

       iii.  <u>Miscia's Opinions</u>

---

[1] I cannot help but note that Officer Taylor relied on *his* professional experience as a police officer to opine, in the criminal complaint, that the object he had recovered from the 3D printed looked like a firearm. *See supra.*, pp. 8-9. What's good for the goose is good for the gander……………..

Defendants seek to exclude Miscia's opinions on what "should be obvious to any member of law enforcement" about the black plastic object.

I agree that a substantial portion of Miscia's five opinions about what "should be obvious to any member of law enforcement" is inadmissible.

But not all of it.

So let us examine the five opinions one by one.

Opinion 1: *"If the remaining 96.67% of the black plastic object were 3D printed, it should have been obvious to law enforcement that the black plastic object would still be incapable of functioning as an operable firearm."* Miscia Report at 6.

This opinion is excluded. Miscia said at his deposition that he lacked familiarity with 3D printed firearms. Miscia Dep. at 64:17-24, 74:7-12. Therefore, notwithstanding his outstanding credentials as a firearms expert, he cannot offer an opinion about what would be obvious about the capabilities of a fully manufactured 3D printed revolver.

Opinion 2: "*In my professional opinion, it should be obvious to any member of law enforcement that the black plastic object [as it exists] is not an operable firearm as described by New York State Penal Law."* Miscia Report at 4.

This opinion is admitted, with slight modification.

Assuming that someone will testify that NYPD officers are given routine firearms training (and Miscia can certainly testify that he has never encountered a police officer, on any force, who was not trained in the use and operation of firearms), Miscia can testify that anyone with a modicum of firearms training would recognize that the black plastic object as it existed could not expel a projectile (i.e., be operable). He can also explain why. Miscia can testify that people who receive basic firearms training are generally taught about the parts of a gun and how

they function. *See generally* Miscia Report; Miscia CV. He can testify that anyone with any familiarity with guns would and should know that the black plastic object is not an operable firearm, because it has no hammer, no barrel, no cylinder, no chamber, and no firing pin – all parts of a revolver that are necessary to render such a gun operable. Miscia Report at 5; *see generally* Miscia CV.

The fact that Miscia refers to the definitions of firearm and operability under New York law does not render his testimony inadmissible.[2] The questioner could ask Miscia: "Do you have an opinion, to a reasonable degree of certainty, whether an individual who had basic training in the use and operation of firearms would consider this black plastic object to be an operable firearm?" "Do you have an opinion, to a reasonable degree of certainty, whether an individual who had basic training in the use of operations of firearms would conclude that this black plastic object is a pistol? A revolver? A rifle? A shotgun?" He can be read the standard Penal Law jury instruction on operability[3] and asked whether any individual who had received basic training in the use and operation of firearms could possibly think that the black plastic object was capable of discharging ammunition – and he can explain the reasons for his conclusion. He can even be read the definition of the term "firearm" in the Penal Law[4] and be asked whether any individual who had basic training in the use and operation of firearms could conclude that the black plastic object fell within that definition. None of this constitutes impermissible testimony about the law. It is opinion testimony about whether, as a matter of fact, a trained police officer would consider

---

[2] The Supplementary Practice Commentaries to N.Y. Penal Law § 265.00 state, "to establish that the weapon in issue is a 'firearm' the courts have required proof of its operability, that is, that it is capable of discharging ammunition." Supplementary Practice Commentary, McKinney's Cons. Laws of N.Y., N.Y. Penal Law § 265.00 (citing *People v. Longshore*, 86 N.Y.2d 851, 852, 633 N.Y.S.2d 475, 657 N.E.2d 496 (1995)).
[3] Model Jury Instructions for N.Y. Penal Law § 265.01-b(1) state, "To be operable, a firearm must be capable of discharging ammunition." N.Y. Crim. Jury Instr. 2d Penal Law § 265.01-b(1).
[4] N.Y. Penal Law § 265.00-3 defines a "firearm" as any pistol or revolver, in addition to certain types of shotguns and rifles.

the black plastic object to be something that the law recognizes as a firearm – an operable revolver, pistol, small bore rifle, small bore shotgun, or assault weapon.

Opinion 3: "*It is my professional opinion, it should also be obvious to any member of law enforcement that the black plastic object could never be an operable firearm as described by the New York State Penal Law.*" Miscia Report at 4.

Miscia cannot offer this opinion, for the same reason he cannot offer Opinion 1.  Miscia, by his own admission, is not an expert in 3D printed firearms and he has no idea what such an object would be capable of doing. Miscia Dep. at 64:17-24, 74:7-12. His subsidiary opinion that "a complete and assembled plastic-printed revolver would explode in the hands of the user" is equally inadmissible. Miscia Report at 6. Not only does he lack relevant experience, but the reason he gives for reaching that conclusion does not rule out operability – Miscia does not say that the object could never expel ammunition while it was exploding. Having the ability to expel is what makes a firearm operable – not exploding as it does so. *Id.*

Opinion 4:  "*In my professional opinion, it should be obvious to any member of law enforcement that the black plastic object was not an attempt to create an operable firearm as described by the New York State Penal Law.*" Miscia Report at 4.

Miscia cannot offer this opinion. Miscia's expertise lies in weaponry and law enforcement. *Id.* at 1. What Plaintiff was attempting to do (if anything) by manufacturing the black plastic object is not within Miscia's area of expertise.

Opinion 5:  "*In my professional opinion, it should be obvious to any member of law enforcement that the black plastic object was not an attempt to create an imitation firearm under the New York City Administrative Code.*" Miscia Report at 4.

For the same reason Miscia cannot offer Opinion 4, he cannot offer Opinion 5.

With that out of the way, we turn to the motion for summary judgment.

## II.     Defendants' Motion for Summary Judgment Dismissing Plaintiff's Claims Is Granted.

Defendants have moved for summary judgment on Plaintiff's remaining claims.

For the reasons stated below, and applying the principles articulated at pages 3-5 of this opinion,

Defendants' motion is granted.

### a.     Defendants' Motion for Summary Judgment Dismissing Plaintiff's § 1983 Claim for False Arrest is Granted.

Plaintiff alleges that he was arrested without probable cause for attempted criminal

possession of a firearm, in violation of New York Penal Law §§ 110/265.01-b(1) on September

21, 2018. Compl. ¶ 3. He asserts § 1983 false arrest claims against Officer Taylor and Sergeant

Kelly.[5]

A claim for false arrest under § 1983 incorporates the elements of a false arrest claim

under state law. *Boyd v. City of New York*, 336 F.3d 72, 75 (2d Cir. 2003). To establish a false

arrest claim under New York law, Plaintiff must show that: (1) Defendants intended to confine

Plaintiff; (2) Plaintiff was conscious of the confinement; (3) Plaintiff did not consent to the

confinement; and (4) the confinement was not otherwise privileged. *See Liranzo v. United States*,

690 F.3d 78, 95 (2d Cir. 2012).

An arrest is privileged if it is based on probable cause. *Jenkins v. City of New York*, 478

F.3d 76, 84 (2d Cir. 2007). "Probable cause to arrest exists when the officers have knowledge or

---

[5] In January 2022, the Court dismissed Plaintiff's § 1983 false arrest claim against Detective Schick and the City. Dkt. No. 30. The Court dismissed Plaintiff's § 1983 false arrest claim against Detective Schick without opposition and with prejudice because no facts were alleged that would tend to show that he participated in Plaintiff's arrest. *Id.* The Court dismissed Plaintiff's § 1983 false arrest claim against the City because the City cannot be held liable on a *respondeat superior* theory when the claim arises under § 1983. *Id.* The Court also dismissed Plaintiff's state law false arrest claim, with prejudice, for failure to timely file a notice of claim. Dkt. No. 32.

reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). Although an officer ordinarily arrests a person for a specific crime, a false arrest claim turns on whether probable cause existed to arrest for any crime, not whether there was probable cause to arrest for the specific crime listed on the arrest sheet. *See Marcavage v. City of New York*, 689 F.3d 98, 109 (2d Cir. 2012).

"Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer *at the time of the arrest*." (Emphasis added). *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) (citing *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)). The evidence to support probable cause need not be enough to support conviction but "must constitute more than rumor, suspicion, or even a 'strong reason to suspect.'" *Roberts by Roberts v. City of New York*, 753 F. Supp. 480, 482-83 (S.D.N.Y. 1990) (quoting *United States v. Fisher*, 702 F.2d 372, 375 (2d Cir. 1985)). "Probable cause can exist even where it is based on mistaken information, so long as the arresting officer acted reasonably and in good faith in relying on that information." *Bernard v. U.S.*, 25 F.3d 98, 102 (2d Cir. 1994) (citation omitted); *Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001).

The only element of Plaintiff's false arrest claim in dispute is whether Officer Taylor (the officer who gave information to the arresting officer) or Sergeant Kelly (the actual arresting officer) – based on what they knew at the time of the arrest – had probable cause to arrest Plaintiff on September 21, 2018.[6]

---

[6] Defendants make much of the fact that Vett gave inconsistent reasons about why he was making the black plastic object – to give to his brother or to rent to someone who might need a prop gun – as contributing to probable cause to arrest (which is also relevant to a motion for malicious prosecution). Defendants' Memorandum of Law in Support of Motion for Summary Judgment at 15; Defendants' Reply Memorandum of Law in Support of Motion for

Defendants argue that Plaintiff's false arrest claim must be dismissed because Officer Taylor and Sergeant Kelly had probable cause to arrest Plaintiff for two offenses: attempted possession of an imitation pistol under the New York City Administrative Code and attempted criminal possession of a firearm under New York Penal Law. I consider them seriatim.

(i)    Attempted possession of an imitation pistol

A person is guilty of an attempt to commit a crime when, with intent to commit a crime, he engages in conduct which tends to effect the commission of such crime. N.Y. Penal Law § 110.00. New York City Administrative Code § 10-131(g) prohibits individuals from possessing an imitation firearm that substantially duplicates or can reasonably be perceived to be an actual firearm. The relevant code provision specifically includes an attempt element, but it is, by its terms, limited to attempting to use or give away the imitation or toy firearm:

> It shall be unlawful for any person to sell or offer for sale, possess,
> or use or attempt to use or give away, any toy or imitation firearm which
> substantially duplicates or can reasonably be perceived to be an
> actual firearm…….

New York City Administrative Code § 10-131(g). This certainly suggests that attempting to possess a toy or imitation firearm does not violate §10-131(g) of the Administrative Code.

Defendants acknowledge that the text of the relevant provision of the Administrative Code § 10-131(g) does not expressly criminalize attempted possession of an imitation or toy firearm. However, they argue that New York Penal Law § 110.00 – the "attempts" section of the Penal Law – applies to the Administrative Code generally. As authority, they cite to *People v.*

---

Summary Judgment at 9. I would agree with their probable cause argument if Vett had made the inconsistent statements to either Officer Taylor or Sergeant Kelly prior to his arrest. However, Vett did not make this statement until after he had been arrested and taken to the station house. Moreover, he made the statement to Detective Schick. Nothing in the record suggests that either Sergeant Kelly or Officer Taylor was aware of the inconsistent statement at the time of the arrest, which is what is relevant in deciding whether probable cause to arrest existed. Significantly, the inconsistency is not mentioned in the criminal complaint sworn out by Officer Taylor.

*Torres*, 35 Misc. 3d 1220[A], 1220A, 2012 NY Slip. Op. 50795[U], *3 (Sup. Ct., Bronx County 2012) – a case in which the defendant argued that the Administrative Code did not criminalize attempting to possess ammunition (N.Y. City Admin. Code §10-131(i)(3)).

This is indeed a slender reed on which to hang so important an argument.

On the one hand, Justice Livote, the author of *Torres,* noted that Section 5.50(2) of the Penal Law provides:

> Unless otherwise expressly provided, or unless the context otherwise requires, the provisions of this chapters shall govern the construction of and punishment for any offense defined outside of this chapter and committed after the effective date thereof, as well as the construction of application of any defense to the prosecution for such offense.

This language unquestionably indicates that the Penal Law (including its general attempts provision) can apply to an "offense defined outside this chapter" – which would presumably include an offense defined in the New York City Administrative Code.

However, the catch-all language of Section 5.50(2) of the Penal Law begins with its own caveat: "Unless otherwise expressly provided, or unless the context requires otherwise…." So the Penal Law (including its general attempts provision) does not automatically apply to an offense defined in the Administrative Code. One must consider whether there is some other relevant provision or context that would rule out such application.

When considering whether the "attempts" section of the Penal Law could apply to §10-131(i)(3) of the Administrative Code, Justice Livote was not confronted with the situation facing this court. The section of the Code that is relevant to this case – §10-131(g) – is the section that deals with toy or imitation guns. That section criminalizes only certain specifically named attempts and does not criminalize others (possessing). The section makes it an offense to "use *or*

*attempt to use [or give away]*"[7] (emphasis added) a toy or imitation gun. In other words, the section of the Administrative Code interpreted by Justice Livote (relating to possession of ammunition) contains no mention of attempts; but the section of the Code relating to toy or imitation firearms most definitely does mention attempts and criminalizes some but not all attempted conduct that is otherwise prohibited by this section.  Specifically, it criminalizes (at most) only the conduct that appears AFTER the word "attempt; it does not criminalize conduct that is listed BEFORE the word "attempt." Possession of a toy or imitation weapon falls into the former category, so attempted possession of such an item perforce does not violate the Administrative Code.

     This, it seems to me, brings the section of the Administrative Code at issue in Vett's case squarely within the precatory language, "Unless otherwise expressly provided, or unless context requires otherwise." The section here under consideration "expressly provides" that the only attempts that qualify as criminal are using or attempting to use (or possibly using and giving away, *see* n.7) a toy or imitation firearm. The overall context of §10-131(g), which incorporates the word "attempts" only in connection with the use (and perhaps giving away) of such a fake gun, strongly suggests that the actions that precede the phrase "use or attempt to use" do not give rise to "attempt" crimes.

     In short, *Torres* simply does not speak to the question in this case. And the better reading of Section 5.50(2) of the Penal Law is that the Penal Law does not apply to the non-attempt

---

[7] The Harvard Comma strikes again! Does the word "attempt" relate to both offenses that follow that word (use or give away) or only to the first of those two offenses (use, as in "use or attempt to use"). Does the Code criminalize attempts to use *or give away* a toy gun, or just attempted use of a toy gun? Fortunately, there is no need, for purposes of this decision, to decide that thorny grammatical issue. Were I forced to decide that question, I would conclude that  the latter reading is the better one, and that the only "attempt" offense criminalized by this section of the Administrative Code is "use or attempt to use." That would be consistent with the fact that "giving away" an imitation or toy firearm is closely analogous to "selling" such an item; the word "sell" appears before the word "attempt" but not after, which means that the attempted sale of a toy or imitation gun does not violate this section of the Administrative Code.

offenses defined in §10-131(g) of the Administrative Code – including specifically, to possession of an imitation or toy weapon.

In reaching this conclusion, I note, as did Justice Livote, that in *People v. Prescott*, 95 NY 2d 665 (2001), New York's highest court (as opposed to the State Supreme Court, which is its lowest) rejected the argument that the Penal Law's "attempts" section applied to two sections of the Vehicle and Traffic Law, on the ground that these statutes were part of an integrated statutory scheme, one that applied exclusive penalties. After careful consideration, I am persuaded that the New York Court of Appeals (whose holding I am required to predict) would conclude that Section 10-131 of the Administrative Code is represents an "integrated statutory scheme" for the City of New York in matters relating to firearms – especially since the laws relating to firearms are very different here in New York City than they are elsewhere in the state. And so, with all respect to my distinguished State Supreme Court counterpart, I am unable to adopt the reasoning he used to distinguish the holding in *Prescott* from the case before him.

In sum, because an "attempt" to "possess" a toy or imitation firearm is not an offense under the New York City Administrative Code, the defendant officers did not have probable cause to arrest Vett for that reason.

(ii)  <u>Attempted criminal possession of a firearm</u>

Whether the defendant officers had probable cause to believe that Vett committed the crime of attempted criminal possession of a firearm is another matter altogether.

Criminal possession of a firearm is an offense defined by the Penal Law, (specifically N.Y. Penal Law §265.00(a)), so Section 110 of the Penal Code (relating to attempts) applies. Under New York Penal Law § 265.01-b(1), a person is guilty of criminal possession of a firearm when he possesses any firearm, which is defined as "any pistol or revolver." N.Y. Penal Law §

27

265.01-b(1); N.Y. Penal Law § 265.00(a). "Although the definition of firearm does not include the requirement that it be operable, courts have held that a person cannot be convicted of criminal possession of a weapon . . . unless the People prove that the firearm possessed by the defendant is operable." *People v. Wesley*, 168 A.D.2d 940, 941, 565 N.Y.S.2d 342 (4th Dept. 1990); *see Butler v. Annucci*, No. 1:18-cv-00474, 2022 WL 7709486, at *5 (W.D.N.Y. July 13, 2022).

Ultimately, of course, it turned out that the black plastic object was not operable and could not be made operable, so Plaintiff could never have been convicted of criminal possession of a firearm. However, Defendants argue that Officer Taylor and Sergeant Kelly, at the time of the arrest, had probable cause to arrest Plaintiff for attempted criminal possession of a firearm. The officers had been told by the theatre's security director that Plaintiff had "arguments," "issues," and "problems" with people working on *The Lion King*; that those people were nervous and in fear because somebody – Plaintiff – had a gun; and that "everybody in the office building felt threatened, they pretty much cleared the place out." Defs. 56.1 ¶¶ 2, 6, 9-10; Deposition of Sergeant Kelly, "Kelly Dep.," Exhibit D to Declaration of James R. Murray in Support of Defendants' Motion for Summary Judgment, at 42:19-24 and 64:4-15; Deposition of Officer Taylor, "Taylor Dep.," Exhibit A to Declaration of James R. Murray in Support of Defendants' Motion for Summary Judgment at 116:11-14. The officers also knew that the black plastic object that Officer Taylor recovered from the printer, while not a revolver, looked like a portion of a revolver; Taylor himself thought that a cylinder could be attached to it. Defs. 56.1 ¶¶ 3-4. True, Officer Taylor did not know whether the black plastic object could be made into an operable revolver from looking at the pieces that were being printed.  Taylor Dep. at 94:7-14, 95:22-96:9, and 105:4-106:2. And Officer Taylor acknowledged that he was unable to determine if the black

plastic object could be an operable firearm, and that determining firearm operability is the lab's responsibility. *Id.* at 94:7-14 and 105:23-106:2.

Even so, at the time of arrest, Officer Taylor claimed to believe, from his training and experience, that the black plastic object that Plaintiff was printing could possibly have been converted to an operable firearm, had it finished printing. *Id.* at 115:9-19. Unfortunately for Officer Taylor, he had no such training or experience: during his deposition, Taylor confirmed that he did not have any training in firing a revolver, the recognition of firearms operability, or 3D ghost guns (which Taylor defined as guns that are manufactured without a serial number). *Id.* at 37:9-11, 42:4-9, 115:25-116:3, and 117:24-118:4. Taylor further confirmed that it was correct to say that he had zero experience in training for the NYPD in ghost guns. *Id.* at 117:20-23. Therefore, he could not rely on his training and experience to justify the arrest.

"An officer may draw inferences based on his own experience in deciding whether probable cause exists." *Ornelas v. United States*, 517 U.S. 690, 700 (1996); *United States v. Cole*, 26 Fed. Appx. 45, 47 (2d Cir. 2001) (summary order) (internal quotation marks omitted). The officer in *Ornelas v. United States*, 517 U.S. 690 (1996), drew from his nine years of police experience and expertise that came from searching approximately 2,000 cars for narcotics to decide that there was probable cause to search for narcotics behind a loose panel in the defendant's automobile. Unlike the officer in *Ornelas v. United States*, 517 U.S. 690 (1996), here, Officer Taylor did not have relevant experience and expertise from which to draw inferences about the black plastic object that was manifestly not yet a firearm. This complicates the probable cause decision and gives rise to a genuine issue of material fact. A reasonable jury could find that it was objectively unreasonable for the defendant officers to conclude that there was probable cause.

But even if Defendants did not have probable cause to arrest Plaintiff, they had "arguable probable cause" to do so, and so are qualifiedly immune from the suit.

An arresting officer is entitled to summary judgment on qualified immunity grounds if a jury, viewing all facts in the light most favorable to the Plaintiff, could conclude that arguable probable cause to arrest existed. *Cerrone v. Brown*, 246 F.3d 194, 202 (2d Cir. 2001); *see Malley v. Briggs*, 475 U.S. 335, 341 (1985). "Probable cause is arguable if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Figueroa v. Mazza*, 825 F.3d 89, 100 (2d Cir. 2016). To decide whether an officer's conduct was objectively reasonable, "we look to the information possessed by the officer at the time of the arrest, but we do not consider the subjective intent, motives, or beliefs of the officer." *Amore v. Novarro*, 624 F.3d 522, 536 (2d Cir. 2010) (internal quotation omitted). Defendants argue that it waw objectively reasonable for them to think that probable cause existed, based on their observation of the object that looked like part of a gun and what they had been told when they arrived at the Minskoff.[8]

I conclude that there is no genuine issue of fact on this score: Defendants had "arguable probable cause" to arrest Plaintiff. Based on the information Officer Taylor possessed at the time of arrest, a similarly situated officer "could have reasonably believed that probable cause existed in light of well-established law." *Lee v. Sandberg*, 136 F.3d 94, 102 (2d Cir. 1997) (emphasis in original). The officers saw something that looked like part of a firearm in the process of being manufactured, in a context that suggested at least the possibility of violence. I cannot say that no reasonable officer would conclude that no crime was being committed in light of that

---

[8] As noted above (*see supra.*, n.6) Defendants also argue that Vett's inconsistent statements about why he was making the gun gave rise to at least arguable probable cause, but since Vett did not make those statements to the arresting officers or prior to his arrest, that dog won't hunt.

information. Therefore, it was objectively reasonable for the officers to conclude that probable cause existed – even if they were wrong.

Plaintiff asserts that Defendants cannot claim qualified immunity on the basis of arguable probable cause, because "there was no potential operable firearm anywhere in sight" at the time of his arrest. Plaintiff also directs the Court's attention to "Defendants' total ignorance regarding 3-D printing, ghost guns, [and] the assessment of the operability of 3D printed guns" and argues that their "total ignorance . . . does not relieve them of the need for probable cause to execute an arrest." And he maintains that Defendants did not have probable cause to arrest him because it was not objectively reasonable for a police officer to mistake the black plastic object for "a nearly operable firearm." Plaintiff's Opposition to Defendant's Motion for Summary Judgment at 10-11, 13-17, 19-20.

But these arguments against qualified immunity do not address  "arguable probable cause." *See supra.*, pp. 29-30. They are based the legally incorrect premise that Defendant Officer Taylor needed to have some specialized knowledge of 3D printing and firearms operability in order to have arguable probable cause. When assessing arguable probable cause/qualified immunity, the issue is not Taylor's subjective beliefs, but whether a reasonable officer could have objectively believed, based on what he saw and was told, that a crime was being perpetrated. Taylor's lack of personal knowledge about 3D printers and firearm operability, while undoubtedly relevant to the existence of actual probable cause, is not relevant to the question of a reasonable police officer's objective belief upon seeing a partially printed gun and being told that there was bad blood between the person doing the printing and his co-workers. Defs. 56.1 at ¶¶ 2-3, 7, 9, 25, 27-28. At the time of the arrest, that was all the information available to Taylor and Kelly. A reasonable officer could have concluded that a

crime was being perpetrated – or, at the very least, it is not possible that no reasonable officer could have reached such a conclusion, based on the available information.

The evidence submitted by Plaintiffs similarly does not raise any genuine issue of material fact on the issue of arguable probable cause.

Detective Von Werne, the NYPD detective who examined the black plastic object on behalf of NYPD's Firearms Analysis Section, testified that the black plastic object that he examined (i.e., as it existed, not as completed) was not capable of discharging a live cartridge and therefore, was not a firearm. This does not address the attempts crime under consideration.

Islah Abdul-Rahim, a co-worker of Plaintiff, testified that in her opinion the black plastic object did not look like a firearm and she did not feel threatened by what she saw on the 3D printer. But Abdul-Rahim is not a police officer and cannot offer opinion testimony about what reasonable police officers would believe. Moreover, her lack of fear does not undercut what the security director told Kelly and Taylor on the day of the arrest. There is no evidence that Abdul-Rahim's opinion about Plaintiff was communicated to the police officers at the time of the arrest.[9]

Finally, the admissible portion of Officer Miscia's expert testimony does not undercut or raise a genuine issue of fact with regard to Defendant's arguable probable cause argument. The only admissible testimony from Miscia goes to whether a properly trained police officer could have concluded, at the time of the arrest, that the black plastic object on the 3D printer was, at the moment it was recovered, either a firearm (as opposed to a piece of a firearm) or operable.

---

[9] Abdul-Rahim's statement that "Nobody at *The Lion King* told [her] that they felt threatened by what was printing on the 3D printer" is inadmissible hearsay, as it is offered for the truth of the matter asserted. Evidence proffered by a party in opposition to a motion for summary judgment must be admissible at trial. *Platt v. Michaan*, 19-cv-4234, 2023 WL 6292770, at *13 (S.D.N.Y. Sept. 27, 2023).

*See supra*, pp. 19-20. As with Detective Van Werne's report, Miscia's admissible opinion raises no genuine issue of fact relating to attempt crimes. Miscia's opinion testimony that no reasonable officer could have concluded, at the time of the arrest, that Vett was attempting to manufacture an operable firearm was excluded. *Id.* Moreover, Miscia is by his own admission not an expert in 3D printing, so his proffered testimony about what a reasonable officer should have known about what can and cannot be done with a 3D printer was also stricken. *Id.*

In sum, Officer Taylor and Sergeant Kelly had at least arguable probable cause to arrest the Plaintiff for attempted criminal possession of a firearm in violation of Penal Law §§ 110/265.01-b(1). That being so, the officers are entitled to qualified immunity from suit for false arrest, and Plaintiff's motion for summary judgment dismissing Vett's § 1983 false arrest claim is granted on that basis.

### b. Defendants' Motion for Summary Judgment Dismissing Plaintiff's Malicious Prosecution Claims is Granted.

Plaintiff alleges that he was subjected to malicious prosecution following his September 21, 2018, arrest. Compl. ¶¶ 2-4. Plaintiff asserted a § 1983 malicious prosecution claim against Officer Taylor and Detective Schick, as well as a state law malicious prosecution claim against Officer Taylor, Detective Schick, and the City.[10]

To prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment and must establish the elements of a malicious prosecution claim under state law. *Manganiello v. City of N.Y.*, 612 F.3d 149, 160-61 (2d Cir. 2010) (internal citations omitted). To establish malicious prosecution under New York law, the Plaintiff must show (i) the initiation or continuation of a criminal proceeding

---

[10] Under New York state law, a municipality may be held vicariously liable on state law claims asserted against individual officers under a theory of *respondeat superior*. *Linson v. City of New York*, 98 A.D.3d 1002, 1003 (N.Y. App. Div. 2012); *see also Bektic-Marrero v. Goldberg*, 850 F. Supp. 2d 418, 434 (S.D.N.Y. 2012).

against plaintiff; (ii) termination of the proceeding in plaintiff's favor; (iii) lack of probable cause for commencing the proceeding; and (iv) actual malice as a motivation for defendant's actions. *Id.*

To initiate a prosecution, a defendant must "play an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." *Rohman v. New York City Transit Authority*, 215 F.3d 208, 217 (2d Cir. 2000) (internal quotation marks omitted). "In malicious prosecution cases brought against police officers, plaintiffs have demonstrated that officers initiated criminal proceedings by having the plaintiff arraigned, by filling out complaining and corroborating affidavits, and by signing felony complaints." *Mitchell v. Victoria Home*, 434 F.Supp.2d 219, 227 (S.D.N.Y. 2006). "An officer who does no more than disclose to a prosecutor all material information within his knowledge is not deemed to be the initiator of the proceeding." *Husbands ex rel. Forde v. City of New York*, No. 05 Civ. 9252 (NRB), 2007 WL 2454106, at *9 (S.D.N.Y. Aug. 16, 2007) (internal quotations omitted), *aff'd,* 335 Fed.Appx. 124 (2d Cir. 2009) (summary order).

Detective Schick is entitled to summary judgment dismissing the malicious prosecution claims as against him. There is not a scintilla of evidence in the record from which a reasonable juror could conclude that Detective Schick initiated the prosecution of the Plaintiff. There is no evidence that Detective Schick ever communicated with the District Attorney prior to the bringing of charges. He did not swear out the criminal complaint.  There is no evidence that he ever completed an affidavit, testified at a grand jury, or even forwarded information to prosecutors (which, as noted, would not be sufficient to hold him liable in malicious prosecution). Though Detective Schick conducted the interview of Vett that was part of the basis for the criminal complaint, ultimately it was Officer Taylor who relayed the statements that

Plaintiff made to Schick to ADA Sears and swore out the criminal complaint.  Defs. 56.1 ¶¶ 12-24, 30-33. Therefore, the malicious prosecution claims against Schick are dismissed.

And so we turn to Officer Taylor.

The first element of Plaintiff's malicious prosecution claims against Officer Taylor is met: the undisputed facts confirm that Officer Taylor initiated the proceedings by signing the felony complaint. *Id.* ¶¶ 33-37.

The second element is also met under both federal and state law.

To prevail on a § 1983 malicious prosecution claim, a plaintiff must demonstrate that he obtained a "favorable termination" of the underlying criminal prosecution. *Thompson v. Clark*, 596 U.S. 36, 39 (2022). The Supreme Court recently held that a plaintiff is not required to show that the criminal prosecution ended with some affirmative indication of innocence; rather, "a plaintiff need only show that his prosecution ended without a conviction." *Id.* at 39, 48-49. Vett's prosecution was voluntarily dismissed by the Manhattan District Attorney. Minutes from March 7, 2019 Hearing ("Hearing Minutes"), Exhibit L to Declaration of James R. Murray in Support of Defendants' Motion for Summary Judgment, at 2:11-16. That qualifies as a termination without a conviction.

New York's law is somewhat more stringent: "any termination of a criminal prosecution such that the criminal charges may not be brought again, qualifies as a favorable termination, so long as the circumstances surrounding the termination are not inconsistent with the innocence of the accused." *Cantalino v. Danner,* 96 N.Y.2d 391, 396 (2001); *see Bellissimo v. Mitchell*, 122 A.D.3d 560, 562 (2d Dep't 2014). But a dismissal of criminal charges *without prejudice* qualifies as a final, favorable termination if the dismissal represents the formal abandonment of the proceedings by the public prosecutor. *Verboys v. Town of Ramapo*, 12 A.D.3d 665, 666 (2d

Dep't 2004) (citations and internal quotation marks omitted) (emphasis added); *see Stampf v. Long Island R. Co.*, 761 F.3d 192, 200-201 (2d. Cir. 2014); *McKenzie v. City of New York*, 17 Civ. 4899, 2019 WL 3288267, at *14-15 (S.D.N.Y. July 22, 2019); *Lawson v. New York Billiards Corp.*, 331 F.Supp.2d 121, 131 (E.D.N.Y. 2004). For example, the court in *Verboys v. Town of Ramapo*, 12 A.D.3d 665, 666 (2d Dep't 2004) found sufficient evidence in the record for the jury to conclude that the criminal proceedings terminated in the plaintiff's favor where the record demonstrated that the prosecution undertook a full investigation but did not proceed with charges because it determined that the allegations against the plaintiff were unsupported by evidence.

The discontinuance in this case qualifies as a termination in Plaintiff's favor. The criminal charges were dismissed, and Vett's case was sealed, because, as the ADA told the court, "an extensive investigation indicates the People will not be able to prove that the defendant attempted to possess an operable firearm, as required under the statute." Hearing Minutes at 2:13-16. As in *Verboys v. Town of Ramapo*, 12 A.D.3d 665, 666 (2d Dep't 2004), the ADA's concession was representative of the formal abandonment of proceedings against Plaintiff.

The third element, or the probable cause element, of Plaintiff's malicious prosecution claims requires a defendant to believe that Plaintiff could be successfully prosecuted. *Angevin v. City of New York*, 204 F.Supp.3d 469, 481 (E.D.N.Y. 2016) (quoting *Kilburn v. Village of Saranac Lake*, 413 Fed. Appx. 362, 363 (2d Cir. 2011)); *Williams v. City of New York*, No. 10 Civ. 09594, 2012 WL 547508, at *6 (S.D.N.Y. Feb. 17, 2012); *see Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 417 (2d Cir. 1999). If there was probable cause to arrest, it will not dissipate between the arrest and the initiation of the prosecution unless "the groundless nature of

the charges [is] made apparent by the discovery of some intervening fact." *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996).

Plaintiff argues that any probable cause Taylor may have had to arrest him for attempted criminal possession of a firearm dissipated as soon as he gave his post-arrest interview, because he told the officers that the gun was a prop and could never be operable. But Defendants argue that Plaintiff's post-arrest interview did not cause probable cause to dissipate, because his exculpatory statements could only be verified through significant additional investigation. I agree that Plaintiff's post-arrest interview did not cause arguable probable cause to dissipate.

But more important, there is no evidence that Officer Taylor did anything to further the prosecution of the case after signing the criminal complaint on September 21, 2018. That fact is critically important. "Once an arrestee is formally charged, the arresting officer is generally no longer responsible for the prosecution, and the chain of causation between the officer's conduct and the claim for malicious prosecution is broken by the intervening independent actions of the court or prosecutor." *Thompson v. Sweet*, 194 F. Supp. 2d 97, 102 (N.D.N.Y. 2002) (citing *Townes v. City of New York*, 176 F.3d 138, 147 (2d Cir.1999)); *see Weiner v. McKeefery*, 90 F.Supp.3d 17, 37 (E.D.N.Y. 2015); *Walker v. County of Nassau*, No. 19-cv-1374, 2022 WL 19402515, at *7 (E.D.N.Y. Dec. 12, 2022). The criminal complaint was sworn out at a time when no one knew for sure whether the black plastic object could be turned into an operable revolver. But the determination that it could not have been turned into an operable revolver – which is the intervening development that eliminated any reasonable belief that Vett could be convicted of attempted criminal possession of a firearm – was not made until four days after Taylor swore out the complaint, on September 25. By that time, he had nothing more to do with the prosecution. It had been taken over by the DA's Office, which not only did not accept the

37

conclusion of NYPD Firearms Analysis Section, but also initiated its own months-long investigation in which Taylor played absolutely no part.

Therefore, because the chain of causation between Officer Taylor's one and only prosecutorial act (the swearing out of the criminal complaint) and the prosecution was broken by the prosecutor's independent intervening decision to reject the view of NYPD Firearms Analysis Section and keep the case alive by conducting his own investigation, the federal and state law malicious prosecution claims against Officer Taylor must be dismissed.

This obviates the need to discuss the fourth element, which is malice. However, I note that Plaintiff has offered not a scintilla of evidence tending to demonstrate that Officer Taylor commenced the criminal proceeding due to a wrongful or improper motive. *Lowth*, 82 F.3d at 573 (2d Cir. 1996) (quoting *Nardelli v. Stamberg*, 44 N.Y.2d 500, 502–03, 406 N.Y.S.2d 443, 377 N.E.2d 975 (1978)). So that is an alternative ground for dismissing the malicious prosecution claim against Taylor.

As both the federal and state malicious prosecution claims against both Schick and Taylor fail on the merits, there is no need to discuss Defendants' alternative argument that they are entitled to qualified immunity.

The motion for summary judgment dismissing the malicious prosecution claims is granted.

### c. Plaintiff Has Abandoned His § 1983 Deprivation of Liberty and Denial of the Right to a Fair Trial Claims and His "John Doe" Claims, So They Are Dismissed.

Plaintiff does not oppose Defendants' motion for summary judgment dismissing his

§ 1983 claims for deprivation of liberty and denial of the right to a fair trial based on

"Manufacturing of Evidence."  "This Court may, and generally will, deem a claim abandoned

when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed."

*Lipton v. Cnty. of Orange, N.Y.*, 315 F.Supp.2d 434, 446 (S.D.N.Y. 2004) (citing cases); *see also*

*S.E.C. v. Kelly*, 765 F.Supp.2d 301, 323 (S.D.N.Y. 2011). Due to Plaintiff's failure to address in

any way Defendants' arguments with respect to these claims, Defendants' motion for summary

judgment dismissing Plaintiff's deprivation of liberty and denial of the right to a fair trial based

on "Manufacturing of Evidence" claims is granted.

Plaintiff has also abandoned his claims against any John Doe defendants. In fact, he has

made no effort to locate or identify them. "Plaintiff had ample time to identify [John Does] but

has failed to do so or to demonstrate why he has been unable to do so." *Coward v. Town and

Village of Harrison*, 665 F.Supp.2d 281, 299 (S.D.N.Y. 2009).  That is the end of the matter.

## CONCLUSION

There were probably better ways for the NYPD and the District Attorney to have handed

this potentially fraught, but ultimately not dangerous, situation. Confiscating the black plastic

object and asking Vett to come to the station house for a chat without arresting him; waiting a

few days until the experts concluded that the black plastic object was not an operable weapon

before making an arrest or lodging any charges; telling Vett that he did a stupid thing and he

should not do anything like that again – any of those options would have made perfect sense and

would not have led to a lawsuit. Any backstage issues (including any overreaction to Vett's

conduct) at *The Lion King* would have been defused; the theatre people could have decided what

to do about Vett's continued employment for whatever reasons seemed best to them; and *The

New York Post* – whose interest in this story, sparked by a middle of the day arrest at a popular

Broadway theatre, may well have played a role in how this story unfolded – would have yawned and turned elsewhere for news.

But that is not how things played out. And while the Court has sympathy for Vett, I cannot say that he was arrested without arguable probable cause, or that he was the victim of malicious prosecution at the hands of the defendant officers.

So, for the reasons articulated above:

Defendants' motion to exclude Officer Peter Miscia's testimony is granted in part, denied in part; and

Defendants' motion for summary judgment is granted and the complaint is dismissed.

The Clerk of Court is respectfully directed to terminate the motions at Docket Numbers 71 and 75, and to close the file.

This constitutes the written decision and order of the Court.

Dated: November 7, 2023

_____
U.S.D.J.